# IN THE SUPREME COURT OF TEXAS

══════════════
No. 13-0596
══════════════

KACHINA PIPELINE COMPANY, INC., PETITIONER,

v.

MICHAEL D. LILLIS, RESPONDENT

═══════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE THIRD DISTRICT OF TEXAS
═══════════════════════════════════════════════════

CHIEF JUSTICE HECHT, joined by JUSTICE GREEN and JUSTICE DEVINE, concurring in part and dissenting in part.

Lillis delivers gas from seven wells to Kachina at two nearby metering facilities. Kachina's gathering system collects gas from Lillis and nine other producers at about 25 delivery points. Kachina transports the gas about a mile to the Barker Central Compression Station and, from there, about seven miles to the Davis Gas Processing Plant. Kachina's gathering system accepts gas from producers at about 50 psig.[1] The average monthly pressure of five of Lillis's wells is 50 psig and of

_____

[1] A pound per square inch, abbreviated "psi", is a unit of pressure resulting from applying a force of one pound to an area of one square inch. The term, "pound per square inch gauge", abbreviated "psig", is used to make clear that the pressure is measured relative to atmospheric pressure, which is around 14.7 psi at sea level. *See generally* John M. Cimbala, *Introduction to Pressure in Fluid Mechanics*, PENN STATE DEPARTMENT OF MECHANICAL AND NUCLEAR ENGINEERING (last visited June 6, 2015), http://www.mne.psu.edu/cimbala/Learning/Fluid/Pressure/pressure_basics.htm. For example, as more of us have recently been made aware, the official rules of the National Football League require footballs to be inflated to 12.5–13.5 pounds per square inch, the pressure that a gauge would measure. *Official Playing Rules of the National Football League, Rule 2-1*, NATIONAL FOOTBALL LEAGUE (October 25, 2013), *available at* http://static.nfl.com/static/content/public/image/rulebook/pdfs/5_2013_Ball.pdf. More accurately, the required pressure is 12.5–13.5 psig.

the other two wells, 85 psig. The suction pressure at the Barker Station is 15 psig; the discharge pressure is 450–500 psig. Davis pays more for delivery of high-pressure gas than for delivery of low-pressure gas.

The parties' Gas Purchase Agreement ("GPA") obligates Lillis to pay for compression that Kachina "installs . . . to effect delivery". The Court acknowledges that "[c]ompression is clearly necessary for re-delivery to Davis's high-pressure intake".[2] The summary judgment evidence conclusively establishes that Kachina's compression effects delivery of Lillis's gas. Kachina's president testified that its compression "has been necessary for Lillis to sell his gas." A consultant testified that "compression is necessary to effect the delivery of Lillis' gas." Lillis's counsel at oral argument conceded that if Kachina's compression were turned off, Lillis's gas could not enter Kachina's pipeline. Lillis himself testified that when he signed the 2005 GPA, he knew he would be paying compression costs. And while this lawsuit has been pending, Lillis has built his own pipeline from his wells to the Davis plant and installed his own compressor across the road from Kachina's compressor.

In the face of this record, the Court concludes that compression would not be needed to effect delivery of Lillis's gas if Kachina delivered it to Davis's low-pressure intake. There are two problems with this argument. First, it is sheer speculation. Nothing in the record suggests that it is true. It is possible, in the abstract, that Kachina's gathering system could be built and operated to effect delivery of Lillis's gas without compression, but whether that system would accommodate the

---

[2] *Ante* at ___.

other producers at present cannot be determined from the evidence before us. Secondly, the GPA does not obligate Kachina to build or operate its gathering system in any particular way, or to deliver gas to a buyer at high pressure or low pressure. The GPA obligates Lillis to pay for compression that effects delivery to Kachina under whatever gathering system it chooses to operate. As the Court admits, "[t]he [GPA] does not address [Kachina's] decisions" to structure its gathering system as it has.

Finally, the Court notes that Lillis's obligation to pay compression costs applies only "if [Kachina] installs compression". The Barker Station was built in 2003 and was in operation when the parties executed the GPA in 2005. The Court thinks "[i]t makes little sense" for the parties to have intended the requirement to cover preexisting compression, even though Lillis had been paying for it and testified that he understood he was to keep paying for it. The Court thinks that what the parties really meant was that Lillis should quit paying for continuing compression but should resume paying if ever new compression were installed. With respect, that makes no sense, which might explain why Lillis did not make such an argument in the trial court or court of appeals.

The Court acknowledges that "downstream centralization of compression is both common and critical to the efficient transportation of gas to market" and that "producers often contract to share in such costs."[3] But the Court's assurance that it has done nothing to disturb industry expectations offers little more than false hope. Today's lesson is that producers' agreements to share

---

[3] *Ante* at ___.

in compression costs are common and critical and will be enforced unless a court can think of a way to avoid them, regardless of the evidence.

Lillis testified that, under the 2005 GPA, he expected to keep paying compression costs. And though Lillis's expectations do not determine the meaning of the Agreement, as the Court rightfully notes, they certainly reflect his perspective on the facts: that Kachina's compression had been and would be effecting delivery of his gas. I would not reward Lillis's efforts to avoid his acknowledged obligation under the GPA. I respectfully dissent.

I do agree with the Court that Kachina's exercise of its right of first refusal did not extend the Agreement for a five-year term.

_____

Nathan L. Hecht
Chief Justice

Opinion delivered: June 12, 2015